**UNITED STATES of America,**
**Appellee,**

v.

**William Horace DECKER, Appellant.**

**No. 12909.**

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1969.

Decided June 2, 1969.

Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Convicted by a jury of mail fraud and sentenced to eight years in prison by the district judge, William Horace Decker appeals, urging for reversal several alleged errors. We find no error and affirm his conviction.

The government's evidence at trial tended to show that for eight or ten weeks following August 14, 1967, Decker financed his travel in a wide arc through the United States by presenting in payment for accommodations, goods and services, some 88 checks [1], totaling about $6,000 or $7,000, drawn on a single fictitious account in the North Carolina National Bank at Charlotte, North Carolina. The jury found him guilty on five counts of violating the federal mail fraud statute, 18 U.S.C. § 1341. The indictment charged a scheme to defraud, and further stated:

> "It was a part of said scheme and artifice to defraud to cash a series of worthless checks in a certain city over a period of days and then to move on to another distant place before his fraud had been discovered, thereby delaying detection and enabling the defendant to continue to perpetrate his fraudulent scheme and artifice to defraud."

Some 21 cities were listed in the indictment as points throughout the United States at which Decker passed the checks knowing they would be sent by U. S. mail to Charlotte for collection. It was specifically alleged in the indictment that Decker caused worthless checks to be sent by mail from these 21 places to Charlotte.

Richard L. Kennedy, Charlotte, N. C., Robert J. Robinson, Asheville, N. C., court-appointed counsel, for appellant.

William Medford, U. S. Atty., Joseph R. Cruciani, Asst. U. S. Atty., on brief, for appellee.

 Citing Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), Kann v. United States,[2]

1. The testimony shows that 103 bad checks were presented to the Bank for payment —but some of these were presented more than once.

2. Decker's reliance on *Kann* is misplaced. The Supreme Court reversed Kann's conviction, holding that the mere cashing of a wrongfully acquired check, and

323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and Dyhre v. Hudspeth, 106 F. 2d 286 (10th Cir. 1939), Decker now urges that his several offenses were complete when goods and services were received, and therefore there could be no violation of 18 U.S.C. § 1341, as the use of the mails in no way furthered his scheme to defraud. The United States takes the position that the passage of these checks through the mails were crucial to the success of Decker's scheme, as he thereby gained the delay necessary to avoid detection before moving on to another city. The only question for decision on Decker's claim that the district court erred in refusing to dismiss the indictment is whether such a scheme, adequately charged in the indictment, constitutes a violation of the mail fraud statute. We conclude that it does.

On similar facts, the Fifth Circuit in Bauman v. United States, 156 F.2d 534 (5th Cir. 1946) reached a similar result, distinguishing *Kann,* and Dyhre v. Hudspeth. We see no need to embroider on the reasoning of that circuit as stated in a paragraph which, if for "Amarillo" we read "Charlotte", might have been written for Decker's case:

"Moreover, in the present case there seems to have been a series of transactions that were substantially identical in that they had the same forgeries against the account of the same company in the same bank and with the same representations as to the employment of defendant by the company against which he had forged the checks. Since the transmittal of the checks through the mails to Amarillo, with the necessity of getting a return thereon before their fraudulent nature was discovered if, indeed, it were ever discovered, was a part of the scheme, and since such delay would enable defendant to give the scheme a wider scope of operations and require less haste in getting away than if the checks had been forged against an account in a local bank where the discovery of the forgery would, perhaps, have been more prompt, we think that the contention that the scheme did not embrace the mailing is contrary to the wording of the indictment and in disregard of the realities."

156 F.2d at 537; *accord,* United States v. Kuiken, 101 F.Supp. 929 (W.D. Tex.1951), *aff'd per curiam* 196 F.2d 223 (5th Cir.), *cert. denied,* 344 U.S. 867, 73 S.Ct. 109, 97 L.Ed. 657 (1952). We find no error in the district court's refusal to dismiss the indictment.

■ Decker next assigns as error the court's overruling of his motions for acquittal at the close of the government's evidence and at the close of all the evidence. As Decker presented no evidence at all, these motions were in effect the same. A review of the trial transcript reveals that the government, offering 25 witnesses and 25 exhibits, presented substantial evidence tending to prove both elements of the crime of mail fraud under 18 U.S.C. § 1341: that Decker had devised a scheme to defraud and that he had knowingly caused the

---

the subsequent mailings involved in its presentation to the drawee bank, did not involve the use of the mails for the purpose of executing the scheme to defraud. However, the *Kann* holding has been clarified in United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946), and United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). It is established that prosecutions are not limited to those situations in which the mailing "aids in originally securing the fruits of the fraud," *Sheridan, supra,* at 385, 67 S.Ct. at 335, but may extend to those situations in which the mailing aids concealment.

"And forgers are notoriously itinerant. Drawing the check upon an out-of-state bank, knowing it must be sent there for presentation, is an obviously facile way to delay and often to defeat apprehension, conviction and restoration of the ill-gotten gain. There are sound reasons therefore why Congress would wish not to exclude such persons [from prosecution], among them the very ease with which they may escape the state's grasp." *Id.* at 391, 67 S.Ct. at 338. We see no conflict with Parr v. United States, 363 U.S. 370, 392–393, 80 S.Ct. 1171, 4 L.Ed. 2d 1277 (1960).

mails to be used for the purpose of executing the scheme. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The motions to acquit were properly denied. United States v. McGonigal, 214 F.Supp. 621, 622 (D.Del.1963); see United States v. Godel, 361 F.2d 21, 24 (4th Cir.), cert. denied, 385 U.S. 838, 87 S.Ct. 87, 17 L.Ed.2d 72 (1966).

 Next, Decker claims he was prejudiced at trial by the erroneous reception of evidence, including blank checks imprinted with the name of his mythical account, seized from him at his arrest. The arrest was pursuant to an indictment for interstate transportation of worthless securities, which was later dismissed. Decker was then immediately indicted on the mail fraud charge. However, during the pendency of the first indictment, in response to various motions by Decker, the district judge directed the return to Decker of all his property not intended to be offered in evidence. It is Decker's claim that upon dismissal of that indictment *all* his property should have been returned, and the district judge erred in failing to suppress and failing to require the United States to return the seized evidence. We do not agree. It is settled that evidence seized during a lawful arrest and search may be used in a later, different prosecution. *E. g.,* Miller v. United States, 354 F.2d 801 (8th Cir. 1966).

Decker's last claim is that he suffered violations of his fifth and sixth amendment rights when handwriting exemplars were taken from him as he was booked following arrest, in the absence of counsel, and later offered in evidence to be compared with the signatures on the bad checks.

 The involuntary taking of handwriting exemplars in the absence of counsel violates neither the fifth nor the sixth amendments, when the signatures are used merely for comparison with questioned documents. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Lewis v. United States, 127 U.S.App.D.C. 269, 382 F.2d 817, cert. denied, 389 U.S. 962, 88 S.Ct. 350, 19 L.Ed.2d 377 (1967). That comparison of handwriting may tend to establish one of the elements of the offense charged is urged by Decker to distinguish this case from *Gilbert.* We think not. In *Gilbert* exemplars were compared with a note handed by the robber to the bank teller. Here the exemplars were compared with the signatures on worthless checks. In neither case was the handwriting of the accused essential to guilt, although in both the similarity of handwriting was highly incriminating. Just as one can rob a bank using a demand note written by another so also can one devise and execute a scheme to defraud involving the use of bad checks and the mails without himself putting pen to paper. Nowhere in the indictment is it charged that Decker signed the checks. It was not an essential element of the crime to prove that he did.

"The taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. * * * A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection." Gilbert v. California, 388 U.S. 263, 266–267, 87 S.Ct. 1951, 1953 (1967).

Moreover, the identification of Decker's signature on the exemplars by an expert was cumulative only in that four other witnesses had testified and identified signatures on the checks as having been made or presented by Decker.

The conviction is

Affirmed.