**UNITED STATES of America, Appellee,**

v.

**John Sherman MILES, Appellant.**

**No. 72–1730.**

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1973.

Decided Sept. 10, 1973.

Rehearing Denied Oct. 10, 1973.

---

James R. Wyrsch, Kansas City, Mo., for appellant.

Gary Cornwell, Sp. Atty., Kansas City, Mo., for appellee.

Before GIBSON, LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Defendant, John Sherman Miles, was convicted of violating 18 U.S.C. § 1341.[1]

1. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or

The government charged in the indictment that the defendant, along with Robert Totten and Gary Morris, participated in a fraudulent scheme to obtain cattle from a cattle sales barn in Fair Play, Missouri, with a no-account check and then to dispose of them "before the check . . . could clear through normal banking channels, and before the Fairplay Sales and Auction Company could thereby become aware of their loss and locate said cattle in the possession of John Sherman Miles."

■ Defendant raises several issues on appeal. We have considered each claim and find all but one lacking in substantiality.[2] We find substance only in the claim that the defendant was entitled to an acquittal at the close of the government's case since there was no evidence that use of the mails played any part in the execution of the scheme. Upon analysis, however, we affirm the conviction.

Robert Totten testified that the defendant, John Miles, Gary Morris and himself devised a plan whereby Morris and Totten, Morris' roommate, would buy some cattle at Fair Play, Missouri, with a no-account check drawn on a bank at Leeton, Missouri, using a false driver's license in the name of "John W. Rogers" as identification. The details of the plan were worked out on three separate occasions. Miles supplied Totten with the false driver's license and a blank counter check from the Leeton, Missouri, bank. After the cattle were bought in the name of Rogers, Morris and Totten returned for them that night in Miles' truck and took them back to Miles' farm. They purchased 71 head of cattle, but because of the size of Miles' truck they had to leave 15 head behind at the auction yards in Fair Play. This fact along with the identification of Miles' truck helped lead to the discovery of the fraud. When Miles received the cattle the plan called for him immediately to dispose of them by selling the cattle at various auction barns in Missouri. The three were to divide up the proceeds equally, but were apprehended before completing the scheme.

The evidence showed that Miles had been in the cattle business for years, buying and selling cattle at various auction companies. According to Totten, Miles picked the particular day, Febru-

---

thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341 (1949).

2. Defendant also asserts as error on appeal that:

(1) The trial judge failed on *one* occasion to properly admonish the jury before a recess not to discuss the case or read about it. This claim is frivolous; the record shows the trial judge meticulously admonished the jury throughout the trial. See Kleven v. United States, 240 F.2d 270, 274 (8th Cir. 1957); Janko v. United States, 281 F.2d 156, 170 (8th Cir. 1960).

(2) There was no corroboration of the testimony of Robert Totten, the accomplice. The record disputes this: For example, the defendant's truck was identified by an independent witness; the defendant was identified as selling the cattle in question; and, as the government notes, the defendant made a false exculpatory statement. In any event such corroboration is not necessary. See United States v. Smith, 464 F.2d 221, 222 (8th Cir. 1972).

(3) The court erred in refusing to give certain instructions relating to the testimony of an informant and the proper construction of § 1341. The defendant was sufficiently protected by the court's instruction on the credibility of an accomplice's testimony. There is no prejudice demonstrated in the court's instruction on § 1341.

(4) The court erred in not requiring the government to comply with 18 U.S.C. § 3500 by disclosing the grand jury testimony of the witness Totten. The record clearly discloses that the court made available to defense counsel the complete transcript of Totten's grand jury testimony.

(5) Exculpatory information possessed by a prospective government witness, Morris, not called by either side, was not disclosed to the defendant. Again, the record discloses that Morris was present to be interviewed; that defendant's counsel declined to interview him, notwithstanding the government's pretrial disclosure to counsel that he should perhaps talk to Morris since "we believe that he may be willing to give testimony at trial which would be favorable to the defense."

ary 21, 1972, to try out the scheme since it was a holiday and the bank at Leeton, upon which the no-account check was drawn, would be closed. According to Totten the three of them discussed the fact that the cattle should be disposed of as soon as possible, within a week at the most, because that is how long it would take for the check "to come back to the place where you wrote the check before they found out it wasn't any good." They did not specifically discuss how the check would go through banking channels.

Defendant urges that the record is void of any evidence that the defendant contemplated use of the mails for furtherance of the fraudulent scheme. In support of this argument defendant relies on Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); and Dyhre v. Hudspeth, 106 F.2d 286 (10th Cir. 1939). The thrust of these cases is that where the fraudulent scheme comes to fruition prior to the use of the mails, the mails are merely incidental to and not an integral part of the scheme. Under such circumstances, section 1341 has been held not to apply since one of the essential elements for violation of the statute is use of the United States mails for the purpose of executing such scheme or artifice. As held in *Dyhre,* where a fraudulent check was written to obtain merchandise, the fact that the banks had to send the check through the mails for collection was merely incidental to the fraud, since the defendant had "accomplished all he set out to do in falsely representing that he had money on deposit in the banks." *Dyhre,* supra at 288. The Tenth Circuit recently reaffirmed *Dyhre,* finding the fraudulent use of a BankAmericard not covered by section 1341 since "the scheme [had] been fully consummated." United States v. Lynn, 461 F.2d 759, 762 (10th Cir. 1972). See also United States v. Maze, 468 F.2d 529 (6th Cir. 1972), cert. granted, 411 U.S. 963, 93 S.Ct. 2145, 36 L.Ed.2d 683 (1973).

However, it is clear that the principle of *Kann* and *Parr* does not establish a rigid rule. As observed by the Seventh Circuit in United States v. Strauss, 452 F.2d 375, 380 (1970), cert. denied, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972):

"However, the Supreme Court has also said that neither *Kann* nor *Parr* announced an inflexible rule that the use of the mails after the victims' money had been obtained can never be for the purpose of executing the fraud. United States v. Sampson, 371 U.S. 75, 80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1965). Here the use of the mails 'caused' by the defendant provided or contributed to a time lag which was intended to aid in avoiding detection. See United States v. Decker, 411 F.2d 306 (4th Cir. 1969); United States v. Hendrickson, 394 F.2d 807 (6th Cir. 1968). The mailing, established by the evidence, we find to have been an integral part of the scheme to defraud."

The *Kann* and *Parr* cases were further explicated by the Supreme Court in United States v. Sampson, 371 U.S. 75, 79–80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962):

"In *Kann,* the defendants defrauded their corporate employer in matters confined to their local region. As a part of their scheme, the defendants had fraudulently obtained checks payable to them which were cashed or deposited at a bank. The use of the mails charged as a violation of the federal statute was the mailing of the checks for collection by the banks which cashed them to the banks upon which they were drawn. Prior to that mailing, the Court found, the defendants had obtained the money they sought, and as far as they were concerned their plan had reached its fruition and come to a complete rest. The scheme, as the Court viewed it, had contemplated no more. The mailing was done by outsiders, the banks, which had no connection whatsoever

with the fraud. *The checks were mailed for the banks' own purposes and not in any way for the furthering of the fraudulent scheme.* In the Court's view it was immaterial to the consummation of the defendants' scheme how or whether the banks which had cashed the checks sought to collect them.

"In *Parr*, the second case upon which the District Court relied, the defendants had obtained gasoline and other products and services for themselves by the use of the credit card of a School District which had authorized the defendants to use the card for the District's purposes only. The mailings complained of in the *Parr* case were two invoices sent by the oil company to the District and the District's check mailed back in payment. Again the Court was able to find that the mailings by the outsiders were not an integral part of the scheme as planned and executed by the defendants and that, as a matter of fact, it was completely immaterial to them what the oil company did about collecting its bill.

"We are unable to find anything in either the *Kann* or the *Parr* case which suggests that the Court was laying down on automatic rule *that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme.* Rather the Court found only that under the facts in those cases the schemes had been fully executed before the mails were used. And Court of Appeals decisions rendered both before and after *Kann* have followed the view that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes." (Our emphasis).

See also Friedman v. United States, 347 F.2d 697, 710 (8th Cir.), cert. denied, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965).

We conclude that there is sufficient evidence to demonstrate that the use of the mails was an essential part of the fraudulent scheme. The facts at bar are distinguishable from those cases where a party merely seeks to obtain merchandise by use of fraudulent checks. Here the scheme had not come to rest. In fact, Miles did not assume an active role in the overall conspiracy until after the cattle had been fraudulently obtained. The scheme was still continuing—possession of the cattle was only a step toward consummation of it. The real goal was to obtain money and the end of the rainbow was not to be reached until Miles sold the cattle and the money was divided up. The one-week delay before the phony check would be processed by the bank was necessary for Miles to resell the cattle. We find the facts and reasoning of the Fourth and Fifth Circuit cases appropriate here.

As the court said in United States v. Decker, 411 F.2d 306, 308 (4th Cir. 1969):

"The United States takes the position that the passage of these checks through the mails were crucial to the success of Decker's scheme, as he thereby gained the delay necessary to avoid detection before moving on to another city. The only question for decision on Decker's claim that the district court erred in refusing to dismiss the indictment is whether such a scheme, adequately charged in the indictment, constitutes a violation of the mail fraud statute. We conclude that it does."

Similarly the Fifth Circuit reasoned in Bauman v. United States, 156 F.2d 534, 537 (5th Cir. 1946):

"Since the transmittal of the checks through the mails to Amarillo, with the necessity of getting a return thereon before their fraudulent nature was discovered if, indeed, it were ever discovered, was a part of the scheme, and since such delay would enable de-

fendant to give the scheme a wider scope of operations and require less haste in getting away than if the checks had been forged against an account in a local bank where the discovery of the forgery would, perhaps, have been more prompt, we think that the contention that the scheme did not embrace the mailing is contrary to the wording of the indictment and in disregard of the realities."

See also United States v. Hendrickson, 394 F.2d 807 (6th Cir. 1968), cert. denied, 393 U.S. 1031, 89 S.Ct. 642, 21 L. Ed.2d 574 (1969).

This court has held:

"[T]he use of the mails in the execution of a scheme to defraud may be established by circumstantial evidence." Corbett v. United States, 89 F.2d 124, 127 (8th Cir. 1937).

Various bankers testified at the trial that the only way they handle a check such as was given at Fair Play is by mailing it to the various other banking institutions involved.

The Supreme Court has said that a defendant causes the mails to be used:

"Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L. Ed. 435 (1954).

Similarly, it has been observed:

"To establish that the several uses of the mail were caused by defendant, it was sufficient to show that he set forces in motion which foreseeably would involve mail uses." Marvin v. United States, 279 F.2d 451, 454 (10th Cir. 1960).

■ The use of the mails by banks to process collection on "out-of-town" checks is a reasonably foreseeable event.

Cf. United States v. Strauss, 452 F.2d 375, 380 (7th Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972).

Judgment affirmed.