UNITED STATES of America, Appellee,

v.

Jimmy F. McEACHERN,* Appellant.

No. 81–5118.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1981.

Decided April 15, 1982.

---

* The docket sheet employs that spelling. The record indicates that the spelling preference of the appellant is Jimmie.

Joseph Dyer, Arlington, Va. (Siciliano, Ellis, Sheridan & Dyer, Arlington, Va., on brief), for appellant.

Sidney M. Glazer, Dept. of Justice, Washington, D. C. (Justin W. Williams, U. S. Atty., Nash W. Schott, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

On February 17, 1981, a four count indictment was returned in the United States District Court for the Eastern District of Virginia charging Jimmie F. McEachern with making false statements in the acquisition of firearms by using a driver's license with a Virginia address at which he did not live, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a).[1] At a pre-trial hearing, the district court denied McEachern's motion to suppress all evidence obtained from his arrest on January 9, 1981. The case was then tried before a jury which found McEachern guilty on all counts. He was sentenced to concurrent terms of two years on each of the four counts.

McEachern appeals his convictions raising two basic contentions. First, McEachern

---

1. Section 922(a)(6) makes it unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter. Section 924(a) provides, *inter alia*, that anyone violating § 922(a)(6) "shall be fined not

more than $5,000, or imprisoned not more than five years, or both."

The first count against McEachern charged an offense on May 5, 1979, in connection with his acquisition of a .22 caliber rifle; the second count charged an offense on June 16, 1979, in connection with his acquisition of a .45 caliber, semi-automatic rifle; the third count charged an offense on November 21, 1979, in connection with his acquisition of a .223 caliber, semi-automatic rifle; and the fourth count charged an offense on December 1, 1979, in connection with his acquisition of two .38 caliber revolvers. All acquisitions were made at the Potomac Arms Corporation (also known as Hunter's Haven).

argues that the trial judge erred in admitting the evidence against him obtained during a warrantless search on the day of his arrest because the arrest was improper and no exceptions to the warrant requirement apply. Second, McEachern argues that the court erred by allowing into evidence irrelevant and highly prejudicial evidence.

## A. The Validity of the Arrest

In order to determine whether the evidence seized after McEachern's arrest on January 9, 1981 was properly admitted, we must first determine whether the arrest itself was proper.

In mid-November of 1980, Alcohol, Tobacco and Firearms Agent Pedersen was, at the request of the FBI, investigating whether McEachern had purchased any weapons from gun dealers in Northern Virginia. On November 17, 1980, while reviewing the records at the Potomac Arms Corporation in Alexandria, Virginia, Pedersen came across ATF forms which showed that Jimmie McEachern had purchased arms from Potomac four times in 1979. Three of the forms listed McEachern's address as 9702 Woodwind Way, Vienna, Virginia. (The fourth form had stated "9807 Woodwind Way" instead of 9702.) The information on the form also indicated that McEachern was born in Goldsboro, North Carolina in 1952. The forms listed his height as 5' 11" but his weight varied on the different forms in the range of 133–145 pounds. The form also noted that the requisite positive identification furnished by McEachern was a Virginia driver's license, # 237–90–9846.

Pedersen went to 9702 Woodwind Way and talked to the owner who said he had never heard of Jimmie McEachern. The owner stated that he had owned the property since January, 1978 and had lived there at all times except from March to June, 1978 when he had rented the property to a person named Haseeb. Pedersen next checked the records of the corporation which had handled the rental of the property. They showed that the property had been rented to Nurudeen Haseeb and his wife and child. The emergency contact on the lease agreement was Clara Summers, 1918 18th Street, N. W., Washington, D. C. Checking DMV records in Washington, Pedersen found that McEachern used 1918 18th Street as his address. Pedersen tried to call the number for Clara Summers given on the lease agreement but there was no answer; he drove by the address and found it was an empty building.

In December, 1980, Pedersen ran a National Crime Information Center (NCIC) check on Nurudeen Haseeb, black male with a general physical description. The check "hit" and indicated that Nurudeen Haseeb was also known as Ronnie McEachern. The physical description for Nurudeen Haseeb was virtually identical to the description of Jimmie McEachern on the ATF forms. The information for Ronnie McEachern, however, listed two 1949 birthdates, in contrast to the date in 1952 reported on the ATF forms for Jimmie McEachern. Nurudeen Haseeb (a/k/a Ronnie McEachern) was wanted on a fugitive warrant from Union County, New Jersey for weapons and narcotics violations in 1978. Pedersen then requested all the information available on Ronnie McEachern from New Jersey authorities. The information indicated that Ronnie McEachern was 5 feet, 11 inches, 145 pounds and born in Goldsboro, North Carolina. The New Jersey officials also forwarded a picture of Ronnie McEachern.

After conducting further investigation in Washington, D. C., Pedersen found that the D. C. Vendor's License Bureau had an application for Jimmie McEachern on file, listing his address as 1918 18th Street. It also stated he was 5 feet, 11 inches tall, 140 pounds and born in 1952 in Goldsboro, North Carolina. An attached photograph was eventually delivered to Pedersen. After comparing the photograph from the vendor's license application and the New Jersey photograph, Pedersen concluded that

Jimmie McEachern, Nurudeen Haseeb and Ronnie McEachern were the same person.[2]

Pedersen contacted the FBI and told them about the information he had obtained during the course of his investigation, including his belief that Jimmie McEachern and Ronnie McEachern were the same person. He also asked the FBI whether they wanted to pursue an interstate flight warrant. Such a warrant was issued on January 5, 1981 and executed on January 9, 1981.

At 2:15 in the afternoon of January 9, the FBI, with the aid of the ATF, arrested Jimmie McEachern on the interstate flight warrant. When he was stopped, FBI Agent Buehler asked if he was Jimmie McEachern. After appellant responded that he was, he was arrested.[3] McEachern was then transported to the FBI field office about 30 minutes away. Upon arrival at the FBI field office, McEachern demanded an attorney and refused to identify himself any further than by admitting he was "McEachern."

FBI Agent Buehler asked McEachern to remove the things from his pockets. McEachern produced a wallet which was searched and inventoried by the FBI. At that time, Pedersen noticed that McEachern had a Virginia driver's license which had the same information Pedersen had found on the ATF forms. In addition, McEachern had a Dart Drug check cashing card. Both the license and the card were seized by Agent Pedersen. Pedersen took the seized cards and made out an arrest warrant application for firearms violations against Jimmie McEachern. While Pedersen was absent, Jimmie McEachern was fingerprinted; around 3:30 P.M., his prints were compared with Ronnie McEachern's prints which had been obtained from New Jersey. They did not match. McEachern, however, was not released.

Later that evening, a magistrate issued an arrest warrant for Jimmie McEachern

based on Pedersen's application; Pedersen served the warrant at about 8:30. Shortly thereafter, handwriting exemplars were obtained. Since no magistrate was available until the next morning, McEachern was held at the Central Cell Block in the District of Columbia until 11:00 the next day when he appeared before the magistrate.

The defense argues that the arrest was improper and that, accordingly, all the evidence derived from the arrest should be suppressed. The arresting officers thought that Ronnie McEachern, Jimmie McEachern and Nurudeen Haseeb were one and the same individual. In actual point of fact they were not. Ronnie McEachern (Nurudeen Haseeb) was Jimmie McEachern's brother.

■ If the police have a valid arrest warrant for one person and they reasonably and in good faith arrest another, the Supreme Court has ruled that the arrest of the "wrong person" is proper. *Hill v. California*, 401 U.S. 797, 802–04, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971). Since there can be no real question that probable cause existed to arrest Ronnie McEachern on the interstate flight warrant, the only issue is whether the agents' mistaken belief that Ronnie McEachern and Jimmie McEachern were one and the same person was reasonable and in good faith.

■ The defense, relying heavily on the fact that the agents knew from the information they had gathered before the arrest that Ronnie's records indicated a different social security number and a different birthdate than those for Jimmie, asserts that the agents' mistaken belief was unreasonable. In addition, even though the agents knew Ronnie was married and had a child, they made no attempt to ascertain whether Jimmie had any brothers or whether he had a family. Although unquestionably factors, the agents' knowledge that Ronnie had a different birthdate and differ-

---

2. The record shows that ATF agent Chisolm and at least one FBI agent also thought the two photos were of the same person.

3. Agent Pedersen testified that before McEachern was put into the car, Pedersen asked McEachern if he was Haseeb; McEachern said he was.

ent social security number is not determinative.

The agents had marshalled the following information which we are satisfied reasonably led them to conclude that Jimmie McEachern, Ronnie McEachern and Nurudeen Haseeb were one and the same person. Nurudeen Haseeb rented a home on 9702 Woodwind Way, the same address found on Jimmie McEachern's Virginia driver's license and on the ATF forms. Jimmie listed the same D. C. address as his home address as the address which Nurudeen had given as an emergency contact on the lease agreement. The physical descriptions the agents had obtained of Ronnie and Jimmie closely matched. Their birthplace was the same. Moreover, after three different agents compared pictures of Ronnie and Jimmie, all of them were of the opinion that the photographs depicted the same person. Finally, McEachern stated to Pedersen that he was "Haseeb," the same Muslim surname under which Ronnie McEachern rented the Woodwind Way home.[4]

Given the existence of strong indicia that Ronnie and Jimmie were the same person, the agents' conclusion to this effect, not shown to have been pretextual,[5] was eminently reasonable, notwithstanding the agents' information that the two had different birthdates and social security numbers. In *Hill*, the Supreme Court stated that "aliases and false identifications are not uncommon." 401 U.S. at 803, 91 S.Ct. at 1110. By the same token, falsification of other types of personal information—birthdate, birthplace, social security number, etc. —may well be used by some criminals, especially fugitives, to make detection more difficult. In view of the information available to the agents, we do not disturb the district court's finding that the agents reasonably believed that Jimmie was Ronnie, and therefore had probable cause to effectuate the arrest. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the [agents'] mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Hill v. California*, 401 U.S. at 804, 91 S.Ct. at 1110.

The legality of the arrest established, the validity of the search of the wallet becomes the next question. Since the wallet was seized without a warrant, one of the exceptions to the warrant requirement must apply for the driver's license and check cashing card found in the wallet to have been admissible.

▮▮▮ Law enforcement officials may conduct a search of an arrestee and inspect objects found on his person without a warrant, not only at the arrest site but also after the arrestee is brought to a place of detention. *See United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). The search of the wallet was incident to arrest and thus permissible. *See, e.g., United States v. Colclough*, 549 F.2d 937, 940 n.4 (4th Cir. 1977) (search of wallets in defendant's vehicle was incident to arrest and permissible even though car had been moved to police station); *United States v. Passaro*, 624 F.2d 938, 943–44 (9th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981).[6]

▮▮▮ Appellant also claims that the handwriting exemplars obtained from him,

---

**4.** Jimmie McEachern's adopted Muslim name is Josef Abdul Haseeb.

**5.** Appellant's argument that the initial arrest was a sham or a pretext is not persuasive. The FBI was interested in McEachern's connections with terrorist organizations but that does not mean that they did not have a good faith belief that he was Nurudeen Haseeb, the man wanted on the interstate flight warrant. Moreover, the evidence seized was used for a gun case; it was not used in a case against Jimmie McEachern's alleged terrorist activities. Under the circum-

stances, the District Court's determination that the arrest was not a pretext arrest is not clearly erroneous.

**6.** The search of the defendant's personal belongings could also be justified as an inventory search. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The district court found that "Whatever was in that wallet was properly inventoried or listed and ascertained incident to a proper arrest."

after it was ascertained that he was not Ronnie McEachern and without the presence of counsel, should have been suppressed. The search of defendant's wallet, and the discovery of the Virginia driver's license and check cashing card within,[7] bolstered Pedersen's probable cause to believe that Jimmie McEachern had committed firearms violations. Even though Jimmie McEachern was later determined not to be the person sought under the fugitive warrant, he was properly detained upon probable cause pending the filing of a complaint by Pedersen before the magistrate for a warrant. *See Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975).

The taking of handwriting exemplars in the absence of counsel, even if involuntary, does not violate the accused's Fifth or Sixth Amendment rights, when the exemplars are used for identification (non-testimonial) purposes, as they were in this case. *See, e.g., United States v. Euge,* 444 U.S. 707, 713, 718, 100 S.Ct. 874, 879, 881, 63 L.Ed.2d 141 (1980); *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967); *United States v. Decker,* 411 F.2d 306, 309 (4th Cir. 1969), *cert. denied,* 396 U.S. 969, 90 S.Ct. 452, 24 L.Ed.2d 435 (1969).

B. *Hunter's Testimony and Plea Agreement*

█ McEachern argues that the District Court erred in permitting the testimony of a government witness named Hunter, and also erred in allowing Hunter's plea agreement into evidence because it was irrelevant and highly prejudicial. Neither claim merits reversal.

Hunter, also a Muslim, was a co-worker and close friend of Jimmie McEachern from about 1978 to 1980. He testified that, from the latter part of July, 1978 to March, 1979, Jimmie McEachern lived at 1205 Crittenden Street in Northwest Washington and at the house of McEachern's aunt, also in the District of Columbia. During that period Hunter saw McEachern just about every day. In March, 1979, McEachern moved to Forestville, Maryland where he resided until October, 1979, when he moved back to Washington, D. C. While McEachern lived in Maryland, Hunter, living only a few houses away, saw him at least a couple of times a week. Hunter testified that McEachern had not lived in Virginia during the time that Hunter knew him. Hunter also testified that he knew McEachern had a Virginia license with a Vienna, Virginia address. The relevance of the testimony is not open to question; it shows not only that McEachern had a Virginia driver's license but also that, during 1979, the year in which the relevant firearms acquisitions occurred, he did not live in Virginia. The Virginia address on the driver's license was, consequently, inaccurate.

In addition, Hunter testified that, in the spring of 1979, he participated in a discussion in McEachern's presence with Davis Powell (a/k/a Daoud Abdullah). Hunter testified that Powell said that the arms had to be purchased in Virginia because Hunter's Haven in Virginia (d/b/a Potomac Arms Corporation) had the commando type weapons they were looking for. The district judge correctly ruled that the testimony was relevant to show knowledge of the defendant, an element of the crime.[8]

█ We are more troubled about the propriety of admitting the plea agreement which Hunter had entered into with the United States Attorney's office (Exhibit 12). The thrust of the defense's contention

---

7. There were some checks which were also seized. The agents testified that McEachern voluntarily threw them away and they merely retrieved them. McEachern testified that the agents told him to throw them away. Since the checks were not introduced into evidence at trial, we have no occasion to rule on their admissibility.

8. The defense attorney admitted as much during his closing argument. "[T]he only evidence in this case that anybody knowingly or intentionally was trying to commit a crime or to deceive the gun salesman is [from] Al Fletcher Hunter."

is that McEachern's terrorist ties [9] were injected into the proceeding indirectly by the plea agreement and, as such, the plea agreement should not have been admitted because the prejudicial effect of the document outweighed its probative value. After a thorough review of the record, we conclude that the district court did not abuse its discretion by admitting Exhibit 12.

At the outset, we credit the district court judge for keeping tight reins over the proceedings to avoid potential prejudice to the defendant by admonishing the prosecutor to keep terrorist activities out of the case.

The plea agreement was first injected into the case in the defense attorney's opening remarks. In fact, although the prosecutor did not mention Hunter, defense counsel devoted much of his opening statement to Hunter's testimony. With respect to the plea agreement, defense counsel stated:

Mr. Hunter is currently residing at Lorton. He is a prisoner doing six to sixteen years on an armed (sic) or burglary while armed. I would ask that you look very closely to Mr. Hunter's testimony. The government is going to ask him to cooperate with them in this and other matters and in return for that they have made a deal with him. I would simply ask that when Mr. Hunter testifies you look at it from that point of view.

. . . .

When the case is all over you will hear that Mr. Hunter has entered into an agreement in which the government is going to forgive about five bank robberies; that he expected he was going to get probation when he was picked up on D. C. charges which had nothing to do with this . . . he expected probation, and then when he got to prison he began to write letters to the government saying, "Hey, I'll co-operate; I will become a government witness; let's make a deal." And you will hear the extent of the arrangement which has been made . . . with the government. And I think after you have heard all this evidence you will be in a

position to judge Mr. Hunter's credibility, because Mr. Hunter is the only witness that will say Jimmie McEachern did anything in this case but make a mistake.

It ill-becomes defense counsel, after such reference to the plea agreement, to object to its introduction at trial.

The plea agreement, dated February 26, 1981, required that Hunter plead guilty on pending gun charges. It also established the following Disclosure Obligation for Hunter:

(b) Mr. Hunter shall truthfully and fully disclose to the Government everything that he knows about the matters concerning this investigation, and about any other matters relating to the illegal purchase of firearms, terrorist activities, the Muslims that he has dealt with at the Islamic House on 5714 16th Street, Washington, D. C., the Islamic Center, 2551 Massachusetts Avenue, N.W., and any other matter that the Government may choose to inquire. Mr. Hunter shall not at any time willfully fail to disclose any material facts. He shall promptly turn over to the Government any and all documents in his possession or control that are in any way related to these matters. Mr. Hunter shall testify truthfully and fully before any grand juries, be they State or Federal and at all trials, if any, in cases at which his testimony may be relevant.

The government, in turn, agreed not to use any of the information Hunter furnished against him and to bring Hunter's cooperation with the government to the attention of the Court at the time of his sentencing for the gun offense to which he had pleaded guilty.

During direct examination, Hunter testified that he was currently serving a six-to-eighteen year sentence for armed burglary and that he had recently pleaded guilty to one count of making a false statement in the acquisition of a firearm. Hunter stated that, pursuant to that plea, he entered into an agreement with the United States Attorney's office which agreed to give him im-

**9.** Jimmie McEachern was purportedly involved with the Islamic Guerillas of America.

munity for his truthful disclosure and cooperation in giving information on various offenses that he had engaged in during the prior three years. At the end of Hunter's direct testimony, Hunter identified Exhibit 12 (which was not yet in evidence) as being the plea agreement he signed. The government moved the Exhibit into evidence. After objection was made by defense counsel, a bench conference followed at which the defense pointed out that Hunter's Disclosure Obligations contained in the plea agreement contained references to terrorist activities and Muslims. After discussion between the lawyers and the judge, the judge stated:

I will keep it out if you want it out.

. . . .

Now, if you start cross-examining this guy and this comes—I am not trying to talk you out of cross-examining him. You can cross-examine any way you want, but I can't say that when you want to go into parts of it that the government may not be in a position of saying, well, if you want to go into part of that, how about the rest of it. . . . At this point I am not going to let it in evidence. . . . [You cross-examine but] I can't conceive of any reason why terrorist activities and so on would come out. At this point I will sustain the objection . . . .

The defense attorney then commenced a blistering attack on Hunter's credibility including the fact that, as part of the plea agreement, he was being freed from prosecution for five bank robberies he had committed in 1979. After the cross-examination, the government strenuously argued that the plea agreement should be admitted to give the jury the full agreement, lest they get the distorted impression that the five robberies were dropped in exchange for

his testimony on the gun charge brought against Jimmie McEachern. (In fact, Hunter had additionally agreed to disclose all he knew about the terrorist organization and other matters.) The trial judge agreed that it would be unfair to let the defense pick and choose the unfavorable parts of the plea agreement and ignore the rest. The judge decided that the jury was entitled to the whole story and allowed Exhibit 12 into evidence.

We agree with the Fifth Circuit's statement in *United States v. Rosson*, 441 F.2d 242, 244 (5th Cir. 1971), *cert. denied*, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971):

. If the defense relies upon the existence of the plea bargain to attack the credibility of the witness, it is not then entitled to preclude the jury from being apprised of additional matters relevant to the bargain so as to leave an incorrect inference that the witness has made a better bargain for himself . . . than in fact he has made.

*See United States v. Roberts*, 618 F.2d 530, 535 (9th Cir. 1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981) ("The plea agreement may be portrayed fully and placed in context so the jury is not misled about its terms or importance."). *Cf. United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir. 1980) ("[W]here the defense plans to impeach witnesses by establishing that their testimony is pursuant to a plea agreement, the government may introduce this evidence in its case in chief.").

Defense counsel tried to impeach the credibility of Hunter by using the plea agreement to best advantage. Although a proper tactical maneuver, the defense counsel cannot distort the agreement by making it look as though Hunter obtained a better deal than he actually received.[10] The de-

---

**10.** McEachern's assertion that the prosecutor deliberately misled the jury by telling it that Exhibit 12 was the whole agreement when in fact it was not is unpersuasive. Pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government provided a letter to McEachern's counsel with information concerning the specific offenses for which Hunter was being given immunity. Al-

though more specific than Exhibit 12 itself, in that the precise offenses were enumerated, all of the offenses in the letter were committed while Hunter was a member of the Islamic Guerillas; Exhibit 12 provided that the government would afford immunity for information about such offenses. Moreover, the defense cross-examined Hunter on the immunity for the gun charges and robbery charges which the

fense counsel was travelling a precarious route by questioning Hunter on the plea agreement; he cannot later complain that the admission of the document, necessitated by the way he cross-examined Hunter, to inform the jury of the whole deal was error.[11] Under the circumstances of the case, we cannot say that the district court committed reversible error.

AFFIRMED.

letter mentioned. The letter also stated that Hunter would not be prosecuted for his role in the assassination of Ali Akbar Tabatabai or an arson committed in the office of the Iranian Times. The defense attorney chose not to question on these matters fearing their prejudicial effect. The trial judge would have rightly excluded such prejudicial evidence if its admission into evidence had been sought by the government. Under the circumstances, the comments of the prosecutor, while not perhaps as precise as possible, did not contain the type of misrepresentation that would warrant reversal.

11. We note that the district judge properly redacted a potentially prejudicial section of the agreement which was unrelated to the specific obligations Hunter had in return for the agreement. The sentence partially blacked out read: "Mr. Hunter has offered the Government his complete and truthful cooperation in this matter; and with regard to all other matters involving the group of individuals known as the Islamic Guerillas of America. These individuals have been acquiring weapons illegally for various purposes." (Underscored portion redacted in Exhibit sent to jury).

In light of our finding that Hunter's Disclosure Obligations were admissible, the United States Attorney's closing remarks quoting those obligations were also proper.