**Tom Loren STINEHART,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 86–128.**

Supreme Court of Wyoming.

Nov. 10, 1986.

team huddle to call signals, thought they were plotting against him.

Leonard D. Munker, State Public Defender, Martin J. McClain, Deputy State Public Defender, Julie D. Naylor, Appellate Counsel, and Nicholas Vassallo, Student Intern, of the Public Defender Program for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., Gerald P. Luckhaupt, Asst. Atty. Gen., and Steven E. Sumida, Legal Intern, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellant Tom Loren Stinehart was found guilty by a jury of kidnapping, in violation of § 6–2–201(a)(ii), W.S.1977, and first-degree sexual assault, in violation of § 6–2–302(a)(i), W.S.1977. He was sentenced to concurrent terms in the Wyoming State Penitentiary of three to six years on the first count and five to ten years on the second count.

We affirm.

On appeal, appellant raises the following two issues:

"Issue I

"Whether the trial court committed reversible error by refusing to admit into evidence the complaining witness' prior statement.

"Issue II

"Whether the district court abused its sentencing discretion when it ordered Appellant incarcerated for three to six years on Count I and five to ten years on Count II with the sentences to run concurrently and credit for time served (21 days) only as to the maximum term."

On September 17, 1985, between ten and eleven a.m., appellant went to the Red Wood Tavern in Cheyenne, Wyoming, where he met Craig Rodgers. Several hours and several drinks later, the two men walked to the Pub where they continued to drink and discussed "getting a lady." At approximately seven p.m., a young woman arrived at the Pub for a drink and a game of pool with friends. When she left the bar a few hours later, appellant and Rodgers were standing outside in the parking lot. The woman walked past the men to her pickup truck. As she searched her purse for her keys, the two men came up behind her. Rodgers grabbed her around the neck, held a knife to her back, and demanded her keys. He told her to open the door and get into the truck. He climbed into the driver's seat next to her, and appellant got in on the passenger's side. Rodgers drove the pickup to a remote area east of Cheyenne, stopped, and told the woman to get undressed. Appellant and Rodgers argued about "who was going to go first." Appellant prevailed, and Rodgers got out of the truck. Appellant then pushed the woman down on the seat and sexually assaulted her. After several minutes, Rodgers began yelling for his turn. He yanked open the door and told appellant to get out of the truck. Appellant protested that he was " 'not finished yet' " but got out of the

truck. Rodgers climbed in with the woman, but appellant said something which angered him so he climbed back out of the truck and began arguing with appellant. The woman locked the doors, found her second set of keys, started the truck, and drove away.

On September 20, 1985, a complaint was filed charging appellant with kidnapping and first-degree sexual assault. After trial to a jury, appellant was convicted on both counts. Rodgers pled guilty to charges of kidnapping and attempted first-degree sexual assault.

## I

During the trial, appellant attempted to impeach the credibility of the victim by using a statement she made to a deputy sheriff shortly after the incident on September 18, 1985. Relying upon the victim's original description of what happened, appellant hoped to demonstrate that he did not possess the intent required for commission of the crimes and that he was not a willing participant. After cross-examining the victim, appellant called the deputy who took the statement to testify as to its authenticity. He then offered a transcript of the statement into evidence. The prosecutor objected on the ground that the statement was cumulative. The district court ruled that the statement was not independent evidence and that the victim had already testified. On that basis, the court declined to admit the statement into evidence. Appellant now contends that the district court abused its discretion in excluding the statement.

It is well established that relevant evidence is generally admissible. *Kelly v. State*, Wyo., 694 P.2d 126 (1985). However, the trial court may, in the exercise of its discretion, exclude relevant evidence in accordance with Rule 403, W.R.E. *Jahnke v. State*, Wyo., 682 P.2d 991 (1984). Rule 403 provides in pertinent part:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed * * * by considerations of undue delay, waste of time, or *need-less presentation of cumulative evidence.*" (Emphasis added.)

In the present case, the statement appellant sought to introduce had been previously used during cross-examination of the victim to elicit the following testimony:

"Q. Do you recall telling Deputy Olsen in your statement[:]

" 'He was yelling at [appellant] to get in'—he, being the driver—'and he'—[appellant]—'didn't really seem like he particularly wanted to.'

"A. I don't remember saying that, no.

"Q. You don't remember telling Deputy Olsen then that the driver then yelled at him, 'and finally he did come around and get in'?

"A. I don't remember saying that, no.

"Q. You don't deny that you said it, though?

"A. No, no.

"Q. So at the time it was your statement to Deputy Olsen that the other man, [appellant], didn't really seem like he particularly wanted to?

"A. I guess. I don't understand your question.

"Q. Well, at the time you talked to Deputy Olsen September—the early morning of September 18th, you told Deputy Olsen that [appellant] didn't really seem like he wanted to get into the truck.

"A. It could be that's in there, yes.

     *     *     *     *     *     *

"Q. Do you remember in your statement to Deputy Olsen on the 18th, * * * [y]ou told Deputy Olsen that: '[Appellant] kept saying, "it's okay, it's okay, just calm down." He was saying that to the other guy that was driving and stuff. I really think he didn't go along with it, didn't exactly agree with it.' Do you recall ever saying that portion?

"A. I don't, so I really don't know.

"Q. You don't recall saying—telling Deputy Olsen, 'I didn't really think [appellant] agreed with it,' and you didn't believe that he went along with it?

"A. That's correct.

"Q. And Deputy Olsen asked you, didn't he, to clarify it? 'This would be [appellant]?' And you said, 'Yes. He didn't really know what to do. Obviously, he went along with it, but he was not angered like the driver was.' Do you remember telling Deputy Olsen that [appellant] didn't really know what to do?

"A. No, I do not.

"Q. But you don't disagree with me that you told Deputy Olsen that?

"A. No.

       *       *       *       *       *       *

"Q. Did [appellant] yell at you and threaten you?

"A. He did not yell at me.

"Q. Did he tell you to take your clothes off?

"A. Yes, he did.

"Q. Do you recall telling Deputy Olsen, * * * '* * * [Appellant] never, never said anything like that at all'?

"A. No, I don't.

       *       *       *       *       *       *

"Q. * * * Do you remember telling Deputy Olsen[:] 'And I didn't do anything for a long time and [appellant] was getting kind of concerned.'

"A. I don't remember saying that, no.

       *       *       *       *       *       *

"Q. But you did tell Deputy Olsen next: 'The driver told me to get back in the truck and [kind of] pushed me around a little bit, pushed me back in the truck.'

"That was the driver, Mr. Rodgers, that was doing that?

"A. Yes, that's correct.

"Q. Then, when you got back in the truck, the driver threatened you with the knife again, didn't he, and told you to take your clothes off?

"A. Yes, he did.

"Q. This is Mr. Rodgers?

"A. Yes, that's correct.

"Q. And he attempted to undress you, and you finally realized that you couldn't deal with Mr. Rodgers.

"A. That is correct.

       *       *       *       *       *       *

"Q. Was Mr. Rodgers out of control?

"A. Yeah, he was very angry.

"Q. And he had a knife?

"A. That's correct.

"Q. Did you ever see [appellant] with the knife?

"A. No, I did not.

"Q. Did [appellant] ever push you around outside the truck?

"A. No, he did not.

       *       *       *       *       *       *

"Q. But you were scared and you didn't know what the driver was doing. He was still yelling at you, the driver was, wasn't he, in the truck, take your clothes off or he would do it?

"A. That's correct.

"Q. So then you turned to him, [appellant], and you said 'Help me.'

"A. Yes, I believe so.

"Q. And [appellant] said, 'It's okay.'

"A. I don't remember exactly what he said to me.

"Q. After you asked [appellant] to help you and you were undressed, that's when [appellant] started telling Mr. Rodgers to get out of the truck so he could go first. Is that the excuse that was used to get Mr. Rodgers out of the truck?

"A. That is what he said, yes.

"Q. [Appellant] started talking to the driver and telling him to get out.

"A. That's correct.

"Q. And then the driver got out, but what did he do?

"A. He stood there by the door.

       *       *       *       *       *       *

"Q. [Appellant] kept telling Mr. Rodgers to just go away and leave him alone.

"A. I believe so, yes.

"Q. Get out of here. Isn't that true?

"A. Yes, he did tell him to go away.

"Q. And he reached across and rolled the window up.

"A. Yes, he did.

\* \* \* \* \* \*

"Q. [Appellant] was nervous, too, wasn't he, and afraid of this man?

"A. I don't know.

"Q. Do you remember telling Deputy Olsen that '[appellant] was nervous, too, and he was trying to talk to me and calm me down and tell me it was all right'?

"A. I don't remember saying that.

\* \* \* \* \* \*

"Q. In fact, [appellant] was yelling at Mr. Rodgers to go away. He was trying to get him away from the truck, wasn't he?

"A. He was trying to get him away from the window.

"Q. But the man wouldn't go away, would he?

"A. No, he wouldn't.

"Q. And it's at that time that [appellant] pushed you back in the seat; is that correct?

"A. That's correct.

"Q. And he told you at that time, something to the effect, 'we have to do this.'

"A. I don't remember that, no.

"Q. Do you remember telling Deputy Olsen that '[appellant] pushed me down and got on top of me and he said, I don't remember, something to the effect of, we have to do this or something, he's right there'?

"A. I don't remember saying that, no.

\* \* \* \* \* \*

"Q. So when Rodgers opened the door, [appellant] told him, 'No, we're not finished yet'; is that correct?

"A. That's correct.

"Q. And he kept saying—[appellant] kept telling you, 'We will get you out of here.'

"A. I don't remember.

\* \* \* \* \* \*

"Q. But it was [appellant] that got Rodgers out of the truck, wasn't it?

"A. Yes. He said something that angered him.

\* \* \* \* \* \*

"Q. Do you remember telling Deputy Olsen[:]

"'The driver kept saying to [appellant], "You're the only one that can be charged with rape right now. What should I be afraid of?" And they were fighting, and I started fumbling in my purse and I found my keys, and I don't know if [appellant] knew if I had found my keys or just closed the door, but he closed the door.'

"A. No, I don't remember it.

"Q. You don't deny that you said that, though?

"A. No.

"Q. And you managed then, because Mr. Rodgers was out of the truck and the two were fighting, you managed then to locate your keys and drive off. Is that correct?

"A. That is correct.

"Q. And you were worried about [appellant], what his condition might be, weren't you?

"A. I was frightened that Rodgers would kill him.

"Q. Because you really thought that [appellant] was trying to help you get away.

"A. I felt that he was trying to get both of us away.

"Q. Because you were afraid for [appellant] and you felt bad that you had left him there, because you really thought that he tried to help get you away.

"You now say maybe he was trying to get both of you away?

"A. Yes.

"Q. [Appellant] was afraid of Mr. Rodgers, too, wasn't he?

"A. I believe so.

\* \* \* \* \* \*

"Q. Do you remember being asked by Deputy Olsen[:]

" 'Do you think that either one of these two guys knew where they were going tonight?'

"Do you remember that?

"A. No, I don't.

"Q. Do you remember your answer was[:]

" 'Yeah. That spot in particular, I know the man that was driving made it sound as though they had discussed it. He kept saying, "We talked about this earlier," or "You agreed to this," or something, and [appellant] kept saying, "I didn't agree to this," or something to that effect. The driver knew exactly what he was doing. He had planned it.'

"Do you remember that?

"A. I don't remember saying that, no.

\*   \*   \*   \*   \*   \*

"Q. Do you remember Detective Olsen asking you[:]

" 'Now when he asked you to do this, was this after [appellant] got out and he got in?'

"And you said: 'No, that was from the very beginning, he started in on that, started talking about it and saying that's what he wanted, and when [appellant] was in with me he was yelling that, you know, and it was really confusing, there was a lot of yelling and I was trying to find my keys. In the meantime, [appellant] was talking to me, saying "find your keys and we'll get out of here." '

"Do you remember telling Detective Olsen that?

"A. No, I do not.

"Q. 'He said, "Let's go back to town and get a motel room, we'll all get a motel together," and this and that.'

"Do you remember that part of it?

"A. I remember that happening. I don't remember telling Detective Olsen that.

"Q. Do you remember telling Detective Olsen[:] 'That's why I say I feel like he was trying to help me.'

"A. No, I don't."

■ As this excerpt clearly demonstrates, during cross-examination appellant used the victim's prior statement to raise a doubt in the minds of the jurors as to whether he was a willing participant in the kidnapping and sexual assault. Through the statement, he raised the inference that:

(1) He did not get into the truck or leave the Pub with Rodgers and the woman voluntarily;

(2) He thought Rodgers and the woman knew each other and were merely playing a practical joke;

(3) Once he realized it wasn't a joke, he tried to help the woman;

(4) He was afraid of Rodgers;

(5) He sexually assaulted the woman because he had to in order to protect her from Rodgers;

(6) When he was finished with the woman and Rodgers got into the truck, appellant purposely said something to anger Rodgers to get him back out of the truck and away from the woman; and

(7) He shut the door of the pickup after Rodgers got out to enable the woman to escape.

Although his version of what happened on September 17, 1985, was fully explored during cross-examination of the victim, appellant contends that the transcript of the victim's original statement was "vital" to his case, because it was the only evidence corroborating his testimony. In support of his claim, appellant relies on *Towner v. State*, Wyo., 685 P.2d 45, 49 (1984), wherein this Court stated, "If there [is] no independent corroborative evidence on the points that the defendant testified to *other than the excluded testimony*, it is improperly excluded." (Emphasis added.) In the present case, extensive evidence corroborating appellant's testimony that he did not participate actively or voluntarily was presented during cross-examination of the victim. Additional support for appellant's version was explored on both direct and cross-examination of other witnesses. The bartender and a female customer at the

Pub testified that while Rodgers was generally obnoxious, appellant kept to himself and did not pester the women in the bar. Officer Olivo, the police officer who took appellant's statement, testified that appellant said he tried to help the woman. In addition, Rodgers testified that appellant tried to keep him out of the truck and that once he was in the truck, appellant pestered him until he got mad and got out of the truck again. Finally, Officer Wheeler testified that the victim said appellant did not seem to realize that Rodgers was serious when he forced the woman into the pickup outside the Pub. This testimony, together with the inferences raised during cross-examination of the victim, constituted independent corroborative testimony as to the nature of appellant's involvement in the crime. Thus, the excluded evidence was not the only evidence corroborating appellant's testimony. Instead, appellant presented ample testimony from which the jury could have concluded that the victim changed her story and that appellant was not a voluntary participant in the kidnapping or the sexual assault. Under these circumstances, we find that the transcript of the victim's statement was properly excluded as cumulative.

██ Even assuming a finding by this Court that the transcript was improperly excluded, we would find the error harmless under the circumstances of this case and affirm appellant's conviction. In order for an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error, the verdict might have been more favorable. *Bishop v. State*, Wyo., 687 P.2d 242 (1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). We find no such possibility here. The evidence of appellant's guilt was overwhelming. A careful review of the victim's statement fails to reveal that its admission might have led to a more favorable verdict. Rather, our reading of the statement leads us to conclude that its admission into evidence would have been more harmful to appellant as it clearly rebutted appellant's absurd contention that he involuntarily raped the victim to protect her from being raped by Rodgers.

## II

██ As indicated previously, appellant's co-defendant, Craig Rodgers, pled guilty to kidnapping and attempted first-degree sexual assault. For those offenses, he was sentenced to two concurrent terms of five to nine years. In contrast, appellant was found guilty by a jury of kidnapping and first-degree sexual assault and was sentenced to concurrent terms of three to six years and five to ten years, respectively.

Citing these facts, appellant contends that the district court abused its discretion in imposing a "longer" sentence upon him than it imposed upon Rodgers for "the same crimes." Appellant argues that "Rodgers' role in the crimes [was] more sinister" than his, that "[t]he victim was terrified of Rodgers and convinced he was going to kill her," and that the victim "indicated that it was through the actions of Appellant that she got away." Given these factors and Rodgers' more extensive criminal record, appellant contends that we should reverse his sentence.

Appellant's argument overlooks a critical distinction. Rodgers was convicted, following his guilty plea, of kidnapping and *attempted* first-degree sexual assault. For each offense, he received a sentence of five to nine years. In contrast, appellant was convicted of kidnapping and *actual* first-degree sexual assault. For the crime of kidnapping, appellant received a sentence of three to six years, a shorter term than Rodgers received for the same crime. For the offense of first-degree sexual assault, appellant received a sentence of five to ten years, a longer term than Rodgers received for a lesser crime.

When reviewing sentencing decisions, the question we must decide is whether the district court could reasonably conclude as

it did. *Shepard v. State*, Wyo., 720 P.2d 904 (1986). In the present case, the district court had before it evidence that appellant may have played a more passive role in the kidnapping than Rodgers. However, the court also was confronted with evidence that appellant, not Rodgers, sexually assaulted the victim. Under those circumstances, we do not find the district court's conclusion unreasonable.

Affirmed.

URBIGKIT, Justice, concurring.

Generally concurring with the court, I would, however, not approve of the evidentiary exclusion of the prior statement of the victim when offered by the defendant to "corroborate his testimony."

Relevant evidence, when challenged as cumulative, is, as to the tendering party, favorable, neutral, or unfavorable. If clearly favorable, rejection is error, and probably cause for reversal if properly documented in the record. Neutral evidence could probably be considered by the trial court to be only cumulative. However, if, for whatever reason tendered, the court may perceive that the evidence is unfavorable, I would not find justification for exclusion.

The mechanism of the mind of man and woman is a mystery, if not an enigma, and the collective call and conclusion of the layman jury cannot be mechanically determined.

Trial counsel, with the expertise of time applied and preparation, should have the right to choose evidence and style of presentation subject only to neutral evidence which only wastes time and unnecessarily fills pages of the record. *Gordon v. United States*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); *Williams v. United States*, 403 F.2d 176 (D.C.Cir.1968). By definition, evidence, to be cumulative, should be essentially neutral in effect, otherwise it would be persuasive and not cumulative. Cf. *Tucker v. Wyoming Coal Mining Company*, 18 Wyo. 97, 104 P. 529 (1909).

The tendered statement in this case was clearly not neutral, since alone it could have justified conviction without supplementation by much live testimony and counsel argument.

If, for whatever reason of defense strategy or trial planning, introduction of statements of this kind is desired, I would not find discretionary justification for exclusion even though the court might view the probable effect differently from counsel.

"Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. * * *

\* \* \* \* \* \*

"We have usually alluded to abuse of discretion in general terms and have not made an exhaustive list of circumstances constituting abuse of discretion, nor do we care to. Each case must be determined on its peculiar facts." *Martin v. State*, Wyo., 720 P.2d 894, 897 (1986).

Subject to reason and constraints of time, counsel should be permitted an opportunity to paint the portrait of facts in his own fashion, whether unlikely or not in decisional effect on the jury. Some hope is better than no hope in a tough case, since losing is losing, no matter how short or long the jury continues in deliberation. It is certainly not the province of the appellate court to redetermine conceived guilt and then automatically characterize everything that occurred prior to the guilty verdict to be harmless error.

Naturally, reason invokes relevance and admissibility in usable text as easily accorded by editorial deletion in preparation for jury consideration.

This having been said as a conclusion of the statement introduction, under the circumstances of this case, I would agree with

the court and concur that exclusion was clearly harmless. The only way that availability of the document for jury-room deliberations could have delayed the conviction verdict would arise from time invested in their reading its explicitly detailed text.

The fact that counsel is denied an effort to introduce what may be considered by the court to be unfavorable evidence for his case does not automatically make the decision of the trial court non-error or even harmless error. In this case, however, I agree with the reasoning and conclusion of the court on the subject, and consequently concur.