Alonzo Jimmy **RAMIREZ,**
Appellant (Defendant),

v.

The **STATE** of **Wyoming,**
Appellee (Plaintiff).

No. 86–212.

Supreme Court of Wyoming.

July 14, 1987.

Leonard D. Munker, State Public Defender, and Julie D. Naylor (argued), Appellate

Counsel, for appellant, Martin J. McClain, Deputy Public Defender, present at argument.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Terry L. Armitage (argued), Asst. Atty. Gen., for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

A jury convicted appellant of attempted second degree murder after he stabbed his girlfriend nine times with an ice pick. On appeal, he raises the following issues: (1) whether the trial court erred in refusing appellant's proposed instruction on abandonment; (2) whether the court erred in excluding the testimony of appellant's expert witness; (3) whether the court erred in failing to grant a mistrial after admission of prior bad acts evidence; and (4) whether the court erred in allowing a cumulative transcript into evidence over appellant's objection.

We affirm.

### FACTS

Appellant Jimmy Ramirez and his victim, Pam Blesi, met in the summer of 1984 when she bought a car from the auto dealership where appellant worked. Over the next few months, he periodically called Ms. Blesi, and they began dating. They soon talked of marriage, and a wedding date was set for June 29, 1985.

Appellant then began acting strangely, sometimes jealous and possessive, sometimes childish, sometimes abusive. In early June, Ms. Blesi learned that appellant had lied to her about his age, at least one prior marriage, possibly more. She called off the wedding, but, being in love with appellant and wanting to work out their problems, she and appellant sought counseling and continued seeing each other.

After attending a movie on August 3, 1985, appellant stayed the night at the victim's apartment. The next morning she asked appellant to leave her apartment. He became angry, grabbed her, struck her in the eye, and then dragged her into the spare bedroom. He told her he was going to kill her, hit her on the forehead, the eye and the jaw, and then he left the room. The victim tried to get away, but appellant grabbed her, dragged her back into the spare bedroom, and kicked her between the legs. He told her not to move or he would kill her, then took off her bathrobe, removed its belt, and tied her wrists behind her back. He tied her ankles together with shoelaces. He left the room but periodically returned to strike her.

Appellant next obtained an ice pick from the kitchen and told Ms. Blesi to roll over so that he could drive it through her stomach into her heart. She refused to roll over. He put the ice pick down, rolled her over on her side and sexually penetrated her. Then he obtained a knife from his travel bag, showed it to her and said: "I've been keeping this handy for about two weeks planning this." When Ms. Blesi told him he would go to jail for what he was doing, he said: "If I leave it like this I'll get three years. If I kill you I'll only get five."

The victim's eye was swelling shut. Appellant, apparently having a change of heart, obtained some ice from the kitchen, untied her, and they went into her bedroom. She put on a swimsuit, went outside, and appellant followed her. She did not attempt to get away because she feared that he would kill her.

Ms. Blesi again asked appellant to leave. He asked for a hug before he left and she refused. He became enraged, dragged her backwards into the apartment, threw her on the floor and began strangling her. When he left her on the floor, she walked to the bathroom and locked the door. Seeing a neighbor outside, she banged on the window to get his attention. Appellant, hearing this, kicked in the bathroom door, and stabbed Ms. Blesi with the ice pick nine times.

At Ms. Blesi's request, appellant called an ambulance which took her to the emergency room, where she was treated for two collapsed lungs, multiple puncture wounds

in her chest and abdomen, and bruises on her forehead, below both eyes, on her lips and on her neck.

Appellant was charged with attempted second degree murder, found guilty after a jury trial, and sentenced to serve a term of 20 to 30 years in the penitentiary.

## ABANDONMENT

Appellant was convicted of attempted second degree murder. The relevant statutes read as follows:

"§ 6-2-104. Murder in the second degree; penalty.

"Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life."

"§ 6-1-301. Attempt; renunciation of criminal intention.

"(a) A person is guilty of an attempt to commit a crime if:

"(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A 'substantial step' is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime.

\* \* \* \* \* \*

"(b) *A person is not liable under this section if, under circumstances manifesting a voluntary and complete renunciation of his criminal intention, he avoided the commission of the crime attempted by abandoning his criminal effort.* Within the meaning of this subsection, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the person's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal intention. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim." (Emphasis added.)

At trial, appellant offered the following instruction on the defense of abandonment:

"Abandonment is a defense if the attempt to commit a crime is freely and voluntarily abandoned before the act is put in process of final execution and where there is no outside cause prompting such abandonment."

The court refused this instruction because there was no evidence that appellant abandoned the enterprise "before the attempt was made, if it was made." Appellant contends that he was entitled to an abandonment instruction because he stopped stabbing the victim before she died and then called an ambulance, thus avoiding the commission of second degree murder through abandonment of his criminal effort and voluntary and complete renunciation of his criminal intention.

 The defense of abandonment as defined in § 6-1-301(b), supra, may be available even after the defendant has taken a substantial step toward commission of the crime. *Haight v. State*, Wyo., 654 P.2d 1232, 1241 (1982). There comes a point, however, when abandonment is no longer possible. In a murder attempt, this point is clearly reached once the actor has injured his victim.

"Assuming a defense of voluntary abandonment, does there come a point at which it is too late for the defendant to withdraw? Obviously there must be, for it would hardly do to excuse the defendant from attempted murder after he had wounded the intended victim or, indeed, after he had fired and missed." (Footnote omitted.) W. LaFave and A. Scott, Criminal Law, § 60 at 451 (1972).

"Attempted murder cannot be purged after the victim has been wounded, no matter what may cause the plan to be abandoned. And probably the same is true after a shot has been fired with intent to kill. On the other hand, although a criminal plan has proceeded far enough to support a conviction of criminal attempt, it would be sound to recognize the possibility of a *locus pentitentiae* so long as

no substantial harm has been done and no act of actual danger committed." R. Perkins and R. Boyce, Criminal Law, 656 (3rd ed. 1982).

"On balance, it is concluded that renunciation of criminal purpose should be a defense to a criminal attempt charge because, as to the early stage of an attempt, it significantly negatives dangerousness of character, and, as to later stages, the value of encouraging desistance outweighs the net dangerousness shown by the abandoned criminal effort. And, because of the importance of encouraging desistance in the final stages of the attempt, the defense is allowed even when the last proximate act has occurred but the criminal result can be avoided, as for example when the fuse has been lit but can still be stamped out. If, however, the actor has put in motion forces that he is powerless to stop, then the attempt has been completed and cannot be abandoned. In accord with prior law, the actor can gain no immunity for his completed effort, as for example when he fires at the intended victim but misses; all he can do is desist from making a second attempt." (Footnote omitted.) Model Penal Code, § 5.01, Comment 8 at 360. (Official Draft and Revised Comments, American Law Institute, 1985.)

██ The abandonment defense, as defined in § 6–1–301(b), supra, requires that the defendant "avoided the commission of the crime attempted *by abandoning his criminal effort.*" The comments quoted above demonstrate that once a defendant has completed his criminal effort, it is too late for abandonment. Appellant's attempt to commit the crime of second degree murder was complete under the circumstances of this case when he stabbed his victim with the ice pick. That he stabbed her eight more times leaves little doubt but that he had attempted to kill her. If calling an ambulance saved her life, it also saved appellant from being convicted of the crime of murder and perhaps a more severe sentence. But, with respect to the attempt, that crime was complete, as he had passed beyond the point at which abandonment was legally possible. Accordingly, he was not entitled to an instruction on that defense.

### EXCLUSION OF DR. BURDICK'S TESTIMONY

In presenting his defense, appellant called Dr. Burdick, a general practitioner, to the stand. When the doctor was asked if she saw the victim, Ms. Blesi, on August 1, 1985, the prosecution objected on the grounds of relevancy and the physician-patient privilege. In a bench conference, defense counsel told the court Dr. Burdick would testify that the victim had a venereal disease which was transmitted to appellant. The court expressed concern that the testimony might be irrelevant and was possibly being offered simply to embarrass and humiliate the witness. Nevertheless, the jury was excused and the defense allowed to make a formal offer of proof by adducing the testimony of Dr. Burdick and appellant outside the presence of the jury.

In the offer of proof, Dr. Burdick was called to the witness stand and testified that when the victim came to see her on August 1 for a renewal of oral contraceptives, she complained of pain in the pelvic area. The pelvic pain was diagnosed as swollen ovaries caused by pelvic inflammatory disease, a common cause of which is chlamydia, a venereal disease. A culture was never taken nor was the victim ever diagnosed as having chlamydia. Dr. Burdick testified that she never saw appellant Ramirez but did write an antibiotic prescription for him. She did not remember why she wrote the prescription but said it was not unusual for her to write such a prescription for a patient's sexual partner. Appellant was then called to the stand and, still outside the presence of the jury, testified that he never saw Dr. Burdick but that the victim told him she had been diagnosed as having chlamydia and both of them should take medication. This completed the offer of proof.

The court ruled the doctor's testimony inadmissible because any possible probative value which might be attached to the evidence was outweighed by the dangers of

unfair prejudice and other countervailing factors in Rule 403, W.R.E., which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Appellant contends that the exclusion of Dr. Burdick's testimony constituted reversible error because the evidence shed light on the relationship between the victim and appellant and was therefore relevant on the issue of intent. Appellant also contends that the doctor's testimony called the victim's credibility into question, as she testified that she did not recall having engaged in sexual acts with appellant after June 22, 1985.

In reviewing a trial court's ruling on the admissibility of evidence, we apply the following standard:

"It has been held generally that the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed. It is also the general rule that the foundation, relevance, competency, materiality, and remoteness are in the sound discretion of the trial court and will be upheld on appeal absent a clear abuse of discretion." (Footnotes omitted.) *Taylor v. State*, Wyo., 642 P.2d 1294, 1295 (1982).

We have defined an abuse of discretion in the following terms:

" 'A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did.' " *Duffy v. State*, Wyo., 730 P.2d 754, 757–758 (1986) (quoting *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980)).

We find no abuse of discretion in the trial court's ruling. The combined testimony of Dr. Burdick and appellant merely suggests that three days before the stabbing, appel-

lant was told that the victim had chlamydia. Presumably appellant intended to use this evidence to argue that he was provoked and acted upon a sudden heat of passion. The judge indicated that he might reconsider his ruling if subsequent evidence demonstrated the relevancy of Dr. Burdick's testimony. The defense did not produce such evidence. After careful consideration, the court determined that because of its remoteness from the crime, the evidence was at best only marginally relevant and that its probative value was outweighed by unfair prejudice. The trial court's ruling was well within the bounds of reason and not an abuse of discretion.

## PRIOR BAD ACT EVIDENCE

Appellant next contends that the jury was improperly exposed to evidence of prior bad acts in violation of Rule 404(b), W.R.E., which provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Ms. Blesi testified, over objection, that appellant sexually assaulted her before the stabbing. This evidence was properly admitted. In *Hopkinson v. State*, Wyo., 632 P.2d 79, 127 (1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), we held that the use of evidence of collateral misconduct is permissible when the misconduct amounts to "an inseparable part of the whole deed." Id. See 2 D. Louisell and C. Mueller, Federal Evidence, § 140 at 215 (1985) (quoting 1 Wigmore, Evidence § 218, (3d. ed. 1940)). The evidence in question was not offered to show criminal propensity. It was offered to explain the circumstances surrounding the four-hour ordeal of terror which began with beatings and sexual assault and culminated in multiple stabbings. It was relevant to the issue of appellant's intent dur-

ing the episode. Accordingly, it was not excludable under Rule 404(b), supra.

Appellant also contends that the trial court erred in refusing to grant a mistrial after Ms. Blesi, on two separate occasions, testified that appellant had abused his prior wives. The first reference to wife abuse came during the following dialogue:

"Q. Okay. The following weekend you moved out of your house?

"A. Yes.

"Q. Why did you move out at such a peculiar hour?

"A. I looked all day Saturday the 29th for an apartment because my parents found out about Jimmy lying about when he got his divorce, and they went down and read the divorce papers. And they had talked to someone, and that person had told my father that he had abused his prior wife and he had abused the other two wives that he had that we couldn't prove. And I didn't believe him. I mean I loved this guy, and I thought if he was going to marry me why would he lie to me about this? And I spent the whole day looking for an apartment because I felt I needed to get into my own territory away from everyone so that I could make my own decisions."

Following this narrative response, appellant made no motion to strike, no request that the witness be admonished, and no request for a curative instruction. The next morning, however, appellant moved for a mistrial. After the motion was denied, appellant told the court he would propose a limiting instruction during the instruction conference.

Shortly after defense counsel resumed his cross-examination she made another reference to wife abuse:

"Q. Okay. Did you start going to the counselor then or did you go to the counselor in February following your argument that you had on Valentine's Day?

"A. No, we went when we had the fight at the Oriental House. It was on a Friday evening, and it was the end of March. And I told Jimmy that I wouldn't see him any more because I called the Safe House. I didn't know

how to take that argument. And I called the Safe House, and they said that if he was willing to talk about it to someone or willing to go to counseling then he probably wasn't abusive. So I told Jimmy on that following Sunday, two days later, that I wasn't going to see him again unless we went to my minister at the Methodist Church. And I told him what had happened. And Jimmy agreed, and we went and told him, and Jimmy told the minister what had happened and cried and said, 'Oh, I've never hit anyone before,' which wasn't true. I mean because he abused his other wives."

This time defense counsel immediately objected, and the court admonished the witness:

"MR. MUNKER: Your Honor, I would object to that. It's hearsay. It's improper.

"THE COURT: Well, I don't know how to avoid that sort of thing when you're inquiring into this area, Counsel. This witness is being asked repeatedly about what certain persons said or didn't say or what her knowledge of what they said or didn't say was. Then she's called upon to anticipate when she should fully respond and when she should not. I would admonish you, Pam, to try to be more responsive to the questions, that is, when you're asked a question by Mr. Munker rather than going on at some length if you would try to respond briefly and succinctly to that specific question, then wait for another question.

"THE WITNESS: Yes, sir."

The jury was given a limiting instruction concerning consideration of prior bad-act evidence received pursuant to provisions of Rule 404(b), W.R.E.

■ Appellant claims that the limiting instruction was insufficient to cure any prejudice and asserts that the trial court's failure to grant a mistrial constitutes reversible error. A trial court's denial of a motion for mistrial is reversible only for an abuse of discretion. See *Scadden v. State*, Wyo., 732 P.2d 1036 (1987).

"The matter of declaring a mistrial, or not, because of improper, voluntary

statements of a witness varies according to the atmosphere of each trial. *Beck v. Wings Field, Inc.*, 122 F.2d 114 (3rd Cir. 1941). Of necessity, it is a matter peculiarly within the sound discretion of the trial judge. He is on the scene and is in a better position than we, as a reviewing court, in assessing the potentially prejudicial impact \* \* \*." *Standard Industries, Inc. v. Mobil Oil Corporation*, 475 F.2d 220, 228 (10th Cir.1973), *cert. denied* 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973).

It has been said that

"a mistrial is an extreme and drastic remedy which should be resorted to only when there has been an error so prejudicial that justice could not be served by continuing the trial." *Brewer v. State*, 269 Ark. 185, 599 S.W.2d 141, 143 (1980).

The trial court perceived the possibility of prejudice from Ms. Blesi's references to wife abuse, but felt that a limiting instruction was more appropriate than the more drastic remedy of declaring a mistrial. We presume that the jury followed its instructions. *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, Wyo., 664 P.2d 27 (1983); *Schmunk v. State*, Wyo., 714 P.2d 724 (1986). The denial of appellant's mistrial motion was not an abuse of discretion.

### CUMULATIVE TRANSCRIPT

During its case in chief, the prosecution called Officer Mary Owen as a witness. On cross-examination, the defense questioned Officer Owen about a taped statement that the victim made to Officer Owen and another officer several days after the stabbing. On redirect, the State moved for admission of an entire transcript of the statement under "the doctrine of completeness." Apparently the prosecution was referring to the doctrine embodied in Rule 106, W.R.E., which provides:

"When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

The defense objected on the grounds of cumulativeness and relevancy. The court overruled the objection, and the transcript was received into evidence. Appellant contends that the transcript was improperly admitted.

■ We agree. The fifteen page document summarized much of the victim's earlier testimony, and most of the transcript was irrelevant to the areas addressed by the defense in its cross-examination. Although the trial court arguably possessed the discretion to admit portions of the statement under Rule 106, W.R.E., it was error to admit the entire statement. The victim had testified fully concerning this incident. Her statement was consistent with that prior testimony and though not hearsay was inadmissible under Rule 801(d)(1)(B). It served only to put before the jury again the victim's entire statement of what she said occurred. Appellant's cumulativeness objection should have been sustained. See *Stinehart v. State*, Wyo., 727 P.2d 1010 (1986). In light of the other overwhelming evidence of guilt which was properly admitted, however, there exists no reasonable possibility that the verdict might have been more favorable to the defendant if the statement had been excluded. *Bishop v. State*, Wyo., 687 P.2d 242 (1984), *cert. denied* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). Consequently, the error was harmless.

Affirmed.

THOMAS, J., filed an opinion concurring and dissenting in part.

THOMAS, Justice, concurring and dissenting.

I certainly agree with the result which is reached by the majority opinion. I disagree with the majority with respect to whether it was error for the district court to receive into evidence the transcript of the victim's statement about which Officer Owen was interrogated by the defense. I do not think it was error to receive that transcript into evidence, and consequently, I would not find it necessary to consider whether it was harmless error.

The strategy of defense counsel is a familiar one that is taught in advocacy institutes, law schools and by writers of trial techniques and tactics. Essentially, the attempt is to introduce into evidence only the favorable portions of a pre-trial statement furnished by a witness, usually the victim. Portions of statements which are taken out of context frequently are misleading in the sense that they do not tell the entire story, and if that is all that is presented from the pre-trial statement, counsel is in a favorable position to argue either that there are inconsistencies in the witness' story or to emphasize the information which was favorable to the accused. The only way to counter such an effort is to be sure that the unfavorable information from the statement is also before the jury. This prevents the utilization of comments out of context, and even though it may duplicate in many respects the trial testimony of the witness, receiving such evidence is an appropriate balance to an attempt by the accused to obtain an unfair advantage.

In this instance, the victim furnished two statements to police officers. One was given to an officer on August 4, 1985, the second was given to Officer Owen on August 7, 1985. During the trial, the defense offered only a portion of the first statement which was favorable to the defense position. The State agreed to the admissibility of that information on the condition that the entire five pages of the first statement be admitted. This was done to assure that the comments in the statement were maintained in their proper context. The admissibility of the August 4, 1985 statement was not an issue raised in this case.

At a later time in the trial, Officer Owen testified as a witness for the State. No questions were asked on direct examination concerning the August 7, 1985 statement, but on cross-examination, defense counsel questioned Officer Owen very skillfully as to selected portions of that statement. Left at that point, the defense clearly would have been able to create the impression that the August 7, 1985 statement was inconsistent with the August 4, 1985 statement and inconsistent with trial testimony.

If that had been the state of the record, an argument that the testimony of the victim was fabricated would have been an effective one to the jury. This tactic was foiled by the introduction of the entire 15 pages of the August 7, 1985 statement into evidence.

Reliance upon *Stinehart v. State*, Wyo., 727 P.2d 1010 (1986), to conclude that the district court erred in receiving the second statement into evidence is misplaced. In that case, this court held that it was not error for the trial court to deny a motion by the defense to introduce a victim's statement previously given to the police on the ground that it was the only evidence which corroborated the defendant's testimony. In that decision, *Towner v. State*, Wyo., 685 P.2d 45 (1984), was distinguished. In the *Towner* case, we held it was error for the trial court to refuse to allow certain witnesses to testify who would have corroborated the testimony of the defendant. We held in *Stinehart v. State*, supra, that *Towner v. State*, supra, did not control because in the later case there was other testimony which corroborated the testimony of the defendant, and the statement of the victim was merely cumulative in light of the other testimony. Neither of those cases involved an instance in which previous statements of a witness were used by an adversary for purposes of impeachment on cross-examination.

Certainly, the concerns implicated by Rule 106, W.R.E., are pertinent. Rule 106, W.R.E., is identical to Rule 106 of the Federal Rules of Evidence. With respect to the federal rule, the Advisory Committee's Note states:

"The rule is an expression of the rule of completeness. McCormick § 56. It is manifested as to depositions in Rule 32(a)(1) of the Federal Rules of Civil Procedure, of which the proposed rule is substantially a restatement.

"The rule is based on two considerations. *The first is the misleading impression created by taking matters out of context.* The second is the inadequacy of repair work when delayed to a point later in trial." (Emphasis added.)

Rule 106, W.R.E., is invoked subject to the provisions of Rule 403, W.R.E., and no doubt there would be instances in which an application of Rule 403, W.R.E., would lead to a conclusion to not receive the proffered evidence. See 1 D. Louisell and C. Mueller, Federal Evidence § 49 at 353 (1977). In making its ruling under Rule 106, W.R.E., however, a trial court must be given ample discretion to determine what portions of the document are necessary to maintain a proper context with respect to any excerpts admitted on behalf of the adversary. As one commentator has stated:

> "Rule 106 wisely avoids any attempt to set a hard and fast rule. The trial court has been granted power to determine whether 'fairness' requires the proponent to introduce all of the writing or other form of recording as relates to the fact sought to be proved." 1 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 106[02] at 106–17 (1986).

With fairness as the essential purpose of this rule, I conclude that the district court did not abuse its discretion in admitting this entire statement into evidence in this case. No portion of that statement encompassed evidence that was inadmissible for any other reason. The questioning by defense counsel, during cross-examination of Officer Owen, was not limited to any specific portion of the statement but covered comments from at least nine pages of the 15–page statement. Under these circumstances, the trial court had ample discretion to find that it was only fair to permit the prosecution to place the entire statement before the jury in order to avoid an implication of fabrication with respect to the testimony of the victim. See *United States v. Andrade*, 20 Fed.R.Evid.Serv. 570, 788 F.2d 521 (8th Cir.1986), cert. denied by *Riley v. United States*, — U.S. —, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986); *United States v. Pierre*, 20 Fed.R.Evid.Serv. 372, 781 F.2d 329 (2d Cir.1986); *United States v. Harris*, 761 F.2d 394 (7th Cir.1985); *United States v. McEachern*, 10 Fed.R. Evid.Serv. 623, 675 F.2d 618 (4th Cir.1982). Also see 29 Am.Jur.2d *Evidence* §§ 268, 839 at 317–318 and 930–931 (1967); C.

McCormick, McCormick on Evidence § 56 at 145–146 (3d ed. 1984).

A literal application of Rule 106, W.R.E., might require that the balance of the document be introduced during cross-examination of the police officer. That approach, however, could interfere with the orderly presentation of evidence, and courts have found in general that compliance with the rule is obtained by permitting the opposing party on redirect examination to present relevant portions of the deposition, written statement or document necessary to maintain the proper context. *Moody v. Pulte Homes, Inc.*, 423 Mich. 150, 378 N.W.2d 319 (1985); 1 D. Louisell and C. Mueller, Federal Evidence § 50 at 361 (1977). The admission of the statement into evidence in this case rather than having it read into evidence by the officer also was within the trial court's discretion. See Rule 611(a), W.R.E.

I conclude that it was not error for the district court to admit the transcript of the statement into evidence after the defense had used selected portions of it to impeach the victim's testimony. Consequently, the harmless error doctrine need not be invoked.

As I said, I do concur in the affirmance of this case.