George ZABEL, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 87–195.

Supreme Court of Wyoming.

Nov. 1, 1988.

James E. Phillips of Phillips, Lancaster & Thomas, Evanston, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Terry L. Armitage, Asst. Atty. Gen., (argued), for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J. Retired.*

CARDINE, Chief Justice.

Appellant George Zabel was charged with four counts of taking immodest, immoral and indecent liberties with a minor, § 14-3-105, W.S.1977. A jury found him guilty on one charge and not guilty of the remaining three charges, and he was sentenced to a term of two to five years in the Wyoming State Penitentiary. Although appellant raises several issues on appeal, we conclude that the trial court committed plain error by allowing the State's expert witness to testify to the credibility of the alleged victims, and we reverse appellant's conviction on that ground. Accordingly, we do not address appellant's other issues.

Appellant George Zabel is an elderly, self-employed carpenter who has three children and four grandchildren. At the time of the trial in this case, Mr. Zabel and his wife lived in Lyman, Wyoming. The alleged victims are two girls, 10 and 13 years old, whose family lived on a ranch between Lyman and Mountain View. The Zabels met the alleged victims' grandparents through a mutual acquaintance. When the girls' grandmother died of cancer, the Zabels began caring for them. The Zabels developed a close relationship with the girls; in 1982 or 1983 the girls told their mother that they wanted to adopt the Zabels as grandparents.

The alleged victims' mother testified that sometime during the first week of December 1986 the older of the two girls began crying after a family meeting and said the reason she was crying was that George Zabel had been "doing things to her." She then told her mother the things Mr. Zabel allegedly had done. The younger girl then related similar incidents involving Mr. Zabel. Following these conversations, the girls' parents reported the alleged incidents to the county attorney's office. On January 28, 1987, an information was filed alleging that Mr. Zabel took indecent liberties with the older of the alleged victims between the dates of January 1, 1980 and November 27, 1986. An amended information was filed February 9, 1987, alleging four counts. The first two counts charged appellant with taking indecent liberties with the older alleged victim between the dates of October 13, 1986 through October 19, 1986 and between November 26, 1986 through November 30, 1986. The third and fourth counts charged appellant with taking indecent liberties with the younger alleged victim during the same time periods.

The case went to trial on April 16, 1987. The jury began deliberating at approximately 11:20 a.m. on April 22 and returned a verdict the next afternoon at 1:50 p.m., finding appellant guilty on Count III and not guilty on the remaining three counts. On June 30, 1987, the court sentenced appellant to a term of two to five years in the state penitentiary. This appeal followed.

Our decision in this case centers upon the testimony of Dr. Mercedes Reisinger, a clinical psychologist who testified for the State. Dr. Reisinger testified that she evaluated the two alleged victims on January 16, 1987. Her examination included a test for mental age, the Thematic Apperception Test (TAT), a Sentence Completion Test, a "Draw Person" test, a "Self Report," the Rosenwide Picture Frustration

---

* Retired June 30, 1988, but continued to participate in the decision of the court in this case pursuant to order of the court entered July 1, 1988.

Study, and a clinical interview. In explaining her evaluation of the two young girls, Dr. Reisinger gave the following testimony:

"Q. Now, with [the older girl] and [the younger girl] and I suppose with all of your children that you evaluate, are you concerned about whether or not the children are fabricating?

"A. Absolutely.

"Q. Is that one of your primary concerns that you're concerned about?

"A. Treatment is my primary concern.

"Q. Treatment. Excuse me, I'm sorry. Treatment is your primary concern?

"A. Yes. I generally am looking at what sort of treatment does this child need. My evaluations are more geared to treatment planning, you know, rather than investigation.

"Q. And I understand that. But you [have] to have some sort of verification process built into your testing procedures, do you not?

"A. Generally, what I'm looking for is authenticity of the reporting.

"Q. Uh-huh.

"A. I'm looking for emotionality linked to the reporting. I'm looking for some inconsistencies in the reporting.

"Q. You're looking for some inconsistencies?

"A. That's correct.

"Q. Why is that?

"A. Because the stories that are to be fabricated are very consistent from person to person to person, from time to time to time. The other thing I'm also looking for is the amount of anxiety around the reporting. There is—Children, if they are fabricating at this age, in the latency age,—

"Q. Uh-huh.

"A. —cannot keep up the act for too long, because of the fact that it is not something, an experience that they can attach to reality. So if someone has told them to say something or if they have decided to say something, you will, after time, find that there will be breakdown in

the facts, that the stories are very inconsistent from time to time to time and then those breakdowns are very noticeable.

"Q. Uh-huh.

"A. They either knowingly say 'No, this didn't happen' or they stick to their story. But they break down in other areas and say—give you clues that, in fact, it didn't happen.

"When children are lying, when people are lying in general, you will find that the authenticity is limited by the fact that there aren't other details provided. For example, if they were in a bathroom, if they say they were in a bathroom when the occurrence—the situation took place and they say that they were sitting on a couch, it's very unlikely that there would be a couch in a bathroom. So those are the kinds of things that I'm looking for.

"The other thing I look for is in the test results, in particular, if there is any psycho—any antisocial psychopathic tendencies that the children may have. I use an example children out to harm someone. I very much look at those ambivalent feelings because if, in fact, the issue is 'Let's get this person,' there may be a motive behind it and I look for what's known as secondary gains.

"Q. Now, a secondary gain—

"A. A motive—

"Q. —is a motive to fabricate?

"A. That is correct, something that the child is going to gain, in fact, in reporting this. Taking [the younger girl] as an example, in her case it was extremely difficult for her to be able to report this, so it was actually a detriment to her to report,—

"Q. Uh-huh.

"A. —not a gain.

"Q. What about with [the older girl]?

"A. The ambivalence was clear there and the emotionality was there. She provided details, you know, which were consistent with what she was saying. Holding back, protectiveness of the person, even though they were greatly hurt.

"Q. Again, would either of these children—Did you see any secondary gain—

"A. No.

"Q. —that could be gained or secondary gain with these children?

"A. No, nothing was apparent.

"Q. Now, people—children—Let me see here.

"Children that are telling the truth have various characteristics; is that correct?

"A. Uh-huh.

"Q. Children that are telling lies have various characteristics?

"A. Generally, yes.

"Q. And what you are talking about, then, is when a child is telling the truth, you look for emotionality?

"A. (The Witness nodded.)

"Q. Small inconsistencies?

"A. Uh-huh.

"Q. Because they are—you just can't—The memory fades?

"A. Right. It's not a pat or response story.

"Q. The amount of anxiety that is present with the child when he's telling the story?

"A. (The Witness nodded.)

"Q. Okay. That sort of thing?

"A. That is correct.

"Q. Any other characteristics?

"A. Antisocial tendencies.

"Q. Antisocial tendencies?

"A. Yes, that's an individual who doesn't feel much remorse and doesn't care who it is that they stick in the back with a knife, basically.

"Q. That's the child that's telling the lie?

"A. Uh-huh.

"Q. Did you see any antisocial tendencies in [the younger girl] or in [the older girl]?

"A. No.

"Q. Did you see any psychopathic tendencies in either of these children?

"A. No.

"Q. And psychopathism (sic)?

"A. [It] goes hand in hand.

"Q. During your interview with the children, specifically, the clinical interview with the children, I take it you talked about the events; is that correct?

"A. They talked about the events.

"Q. And those discussions, you listed from each of the children their explanation of what had happened to them; is that correct?

"A. That's correct.

"Q. Okay.

"A. Briefly, because they had already been interviewed. So my purpose was not necessarily to get the details of the incident as much as the treatment, so I was focusing on the test results."

Although the defense did not object during this testimony, appellant now contends that its admission amounted to plain error because Dr. Reisinger was allowed to testify to the alleged victims' credibility.

■ It is well established in Wyoming that an expert witness cannot vouch for the truthfulness or credibility of an alleged victim. *Lessard v. State*, Wyo., 719 P.2d 227, 233 (1986). In Lessard, we explained that the question of credibility is for the jury, who are themselves expert in that area. Consequently, the testimony of a psychologist or other expert on the issue of credibility does not assist them and therefore does not satisfy the requirements of Rule 702, W.R.E.[1]

On several occasions, this court has addressed the propriety of expert testimony on the credibility of sexual assault victims. In *Lessard*, supra, a rape crisis counselor testified that most rape victims ask their assailants not to tell anyone about the inci-

---

1. Rule 702, W.R.E. provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

dent. Id. at 233. We held that this testimony was permissible because it helped the jury understand one aspect of the evidence —the victim's request to her assailant— and because the expert's explanation did not constitute testimony with respect to the veracity of the victim. Id. at 234. In *Scadden v. State*, Wyo., 732 P.2d 1036 (1987), a police detective testified that victims often delay in reporting sexual abuse or assault, and she went on to explain the reasons for this delay. Id. at 1044–45. We held her testimony admissible because it was "offered to rebut the implication by the defense that the victims' delay in reporting the incident was inconsistent with their claims of nonconsensual sexual relations." Id. at 1046. In *Griego v. State*, Wyo., 761 P.2d 973 (1988), a rape crisis counselor testified that when the adolescent victim did not immediately flee the scene and report the incident, her behavior was consistent with the typical behavior pattern of adolescent victims of sexual assault. We observed that this testimony helped explain the victim's behavior and held that its admission did not constitute plain error.

█ In all three of these cases, the challenged testimony was allowed because it assisted the jury in understanding some peculiar aspect of the victim's behavior and because it did not involve a comment on the credibility or truthfulness of the victim. Case law from other jurisdictions supports our conclusion that expert testimony which meets these two criteria does not invade the province of the jury. See, e.g., *People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984); *United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987); *State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986); *State v. Catsam*, 148 Vt. 366, 534 A.2d 184 (1987); *Commonwealth v. Ianello*, 401 Mass. 197, 515 N.E.2d 1181 (1987). We realize that in many instances, testimony of this nature will have the incidental effect of supporting or bolstering the credibility of the witness. *Griego*, supra. Nevertheless, that effect alone need not render the testimony inadmissible, as "[m]ost testimony, expert or otherwise,

tends to support the credibility of some witness." *State v. Kennedy*, supra, 357 S.E.2d at 367.

In another recent sexual misconduct case, we examined expert testimony which was not offered to explain the victim's post-incident behavior. In *Brown v. State*, Wyo., 736 P.2d 1110 (1987), Dr. Mercedes Reisinger, the same expert who testified in this case, testified that she administered several personality tests to the victim. One of these tests was the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Reisinger was asked if there were any measures of reliability built into the MMPI, and she identified three validity scales. She was then asked if there were any significant results from any of the three scales. Her response was that all three scales were "within normal limits" and this meant that "the individual approached the test from a very truthful fashion." When this testimony was challenged on appeal, we concluded that it did not concern the victim's version of the incident and that it was merely offered to demonstrate the reliability of the test administered by the psychologist. Accordingly, we concluded that the admission of the testimony was not plain error because appellant failed to demonstrate that a clear and unequivocal rule of law was transgressed in a clear and obvious, not merely arguable, way. Id. at 1115.

█ In contrast to the testimony challenged in Brown, the testimony given by Dr. Reisinger in the present case did not concern any built-in reliability scales in any specific, standardized test. Moreover, unlike the expert testimony in *Lessard, Scadden* and *Griego*, supra, the disputed testimony was not linked to any peculiarities in the alleged victims' behavior following the incidents. Instead, the testimony was directed to whether the children were "fabricating" and toward Dr. Reisinger's search for "authenticity of the reporting," "inconsistencies in the reporting," "anxiety around the reporting," a "breakdown in the facts," and "sufficient detail." Despite the State's thinly-veiled attempt to characterize Dr. Reisinger's testimony as mere verifica-

tion of testing procedures, it is abundantly clear that she was discussing truthfulness criteria in connection with the alleged victims' reports of the incidents of sexual abuse.

Dr. Reisinger, in effect, led the jury through her truthfulness evaluation, including her conclusions. She stated that she looked for "secondary gains," which she described as "something that the child is going to gain, in fact, in reporting this." Secondary gain, she explained, may provide a motive for fabrication. She indicated that she saw no secondary gain in these particular children. She was asked about "various characteristics" which are seen in "children that are telling lies." She said that one of these characteristics was "antisocial tendencies." She stated that she saw no antisocial tendencies in these children.

In order to establish plain error, appellant must demonstrate a transgression of a clear and unequivocal rule of law in a clear and obvious way which adversely affects a substantial right. *Jones v. State*, Wyo., 580 P.2d 1150 (1978). A clear and unequivocal rule of law exists concerning this type of testimony: The credibility of witnesses is the exclusive province of the jury and may not be the subject of expert testimony. *Lessard*, supra 719 P.2d 227. Dr. Reisinger's testimony clearly and obviously transgressed this rule of law, as it constituted a psychologist's evaluation of whether the alleged victims were lying in their "reporting." The only question remaining under the plain error test is whether the error affected a substantial right or, in other words, whether the error was harmful.

For an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error the verdict might have been more favorable to the defendant. *Bishop v. State*, Wyo., 687 P.2d 242 (1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). It has been said that "[p]erhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." 3A

Wright, Federal Practice and Procedure: Criminal 2d § 854 at 305 (1982). We have, on several occasions, concluded that an error was harmless when the evidence of a defendant's guilt was overwhelming. See, e.g., *Ramirez v. State*, Wyo., 739 P.2d 1214 (1987); *Stinehart v. State*, Wyo., 727 P.2d 1010 (1986); *Story v. State*, Wyo., 721 P.2d 1020, cert. denied 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986). This case does not fall into that category. The State provided no physical evidence to support its case; it relied solely on testimonial evidence. The case involved a close factual dispute. The jury, after deliberating for a full day, acquitted appellant on three of the four counts charged. We cannot conclude that the strength of the State's case rendered the error harmless.

When reviewing an erroneous ruling admitting or excluding evidence, the following considerations, among others, may aid in determining whether the error is harmless: (1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury. 1 Weinstein's Evidence, ¶ 103[06] (1986). In this case, these considerations compel us to conclude that the error was indeed harmful:

1. The tainted evidence unquestionably furnished important corroboration of the children's testimony.

2. It related to a material and consequential fact—the credibility of the children. The trial judge correctly observed, more than once, that the case turned on the question of whether the jury believed the children or the defendant. The prosecutor concurred with this assessment of the case in his closing statement when he said:

"This case is about victimization and this case, when everything is said and done, comes down to this. There are three witnesses: [the two girls] and George Zabel. Which of those three are you going to—are you going to believe?

Which of those three testimonies are you going to believe and which of those three are you going to discard? That's all this case comes down to. Who do you believe and who don't you believe."

3. During his closing argument, the prosecutor relied on Dr. Reisinger's testimony concerning the credibility of the children:

"And Mercedes Reisinger talked about secondary gain. Secondary gain. What do these children have to gain by fabrication, by lying? What could possibly motivate these children? What false motive could—could possibly cause them to come into this courtroom and testify falsely? She saw none."

4. Cumulativeness is not an important consideration in this case, as the introduction of additional expert testimony on the credibility of the children would have only compounded the error.

5. We recognize that the court instructed the jury that expert testimony should not be used as evidence of truthfulness or untruthfulness of any witness.[2] In prior cases we have stated that the jury is presumed to follow its instructions. See, e.g., *Ramirez v. State*, supra 739 P.2d 1214. Yet "it would be wrong to think that curative action can take the sting out of every mistake." Wright, supra, at 316–19. The United States Supreme Court has said:

"Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless * * * there are some contexts in which the risk that the

jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (Citations omitted.) *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

When an error is so prejudicial that we cannot be sure the jury was not influenced by it, we will reverse despite curative instructions from the judge. See Wright, supra, at 321 and cases cited.

Credibility was the central issue for the jury in this case. In our view there exists a reasonable possibility that in the absence of the erroneously admitted expert testimony on credibility the verdict might have been more favorable to appellant. The error was not harmless.

REVERSED.

THOMAS, Justice, dissenting, with whom BROWN, Justice, Retired, joins.

I would affirm the conviction in this case. Had the challenged testimony been admitted over the objection of Zabel, I would agree that the trial court had erred. I am not satisfied, however, that the record in this instance truly discloses that a clear and unequivocal rule of law was transgressed in a *"clear and obvious way."* (Emphasis added.) Certainly, what occurred in the courtroom did not induce counsel to complain.

In my judgment, the decision of the court in this instance really is designed to address an unarticulated claim of inadequate representation. Because I do not feel that I am in a position to second guess the tactical or strategic decisions of counsel in this particular instance, I conclude that, if Zabel was damaged by the failure of his counsel to object, it would be better to

---

**2.** The instruction provided:

"During this trial you have heard testimony from psychologists regarding the psychological aspects of sexually abused children and those who sexually abuse children. This evidence was admitted for the limited purpose of providing information of the psychological aspects of this type of offense.

"This evidence was not admitted, nor should it be used by you as evidence of truthfulness or untruthfulness of any witness. The truthfulness or untruthfulness of witnesses is for the jury to decide after consideration of all of the evidence in the case."

permit that issue to be raised in a proceeding which would involve a hearing to determine whether Zabel's attorney had some valid ground for not raising an appropriate objection.

In this instance, the court is substituting its strategic and tactical judgment for that of defense counsel in the exercise of hindsight. I am not satisfied that the criteria for addressing plain error are met in this case and, for that reason, I would affirm.